# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

SIERRA CLUB, INC. and RIVERKEEPER, INC.,

               Plaintiffs,

v.

BEN WEITSMAN & SON, INC.; UPSTATE
SHREDDING DISC, INC.; UPSTATE SHREDDING,
LLC; WEITSMAN SHREDDING, LLC; WEITSMAN
RECYCLING, LLC; BEN WEITSMAN OF ALBANY,
LLC; BEN WEITSMAN OF ITHACA, LLC; BEN
WEITSMAN & SON OF ROCHESTER, LLC; BEN
WEITSMAN & SON OF SYRACUSE, LLC; BEN
WEITSMAN OF HORNELL, LLC; BEN WEITSMAN &
SON OF JAMESTOWN, LLC; and BEN WEITSMAN OF
ALLEGANY, LLC,

               Defendants.

-------------------------------------------------------------

Case No. <u>1:21-CV-546 (LEK/DJS)</u>

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiffs Sierra Club Inc. ("Sierra Club") and Riverkeeper, Inc. ("Riverkeeper")

(collectively, "Plaintiffs"), by and through their counsel, hereby allege:

## I.

## INTRODUCTION

1.    This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the

Act" or "CWA") to address and abate the above-named Defendants' ongoing and continuous

violations of the Act. 33 U.S.C. § 1365.

2.    Defendants discharge polluted stormwater runoff from ten metal recycling yards

(collectively referred to as the "Weitsman Facilities" or the "Facilities") into the waters of the

United States in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p),

and the New York State Department of Environmental Conservation SPDES Multi-Sector

General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-

17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General

Permit").

      3.     Defendants' violations of the General Permit and the Clean Water Act include,

*inter alia*: discharges of polluted stormwater and other pollution that are not authorized by the

General Permit; inadequate pollution control measures; inadequate stormwater pollution

prevention plans; and the release of pollutants that cause or contribute to violations of water

quality standards in receiving waters.

      4.     Stormwater runoff is one of the most significant sources of water pollution in the

nation—comparable to, if not greater than, contamination from industrial and sewage sources.

With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into waters

across New York.  The State of New York has designated as "impaired" more than 7,000 river

miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10

miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act,

"impaired" means not meeting water quality standards and/or unable to support beneficial uses,

such as fish habitat and water contact recreation.  In many of these waters, state water quality

standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic

pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the

overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a

primary source of the pollutants causing the impairment.

      5.     Defendants' stormwater discharges contribute to this endemic stormwater

pollution problem.  Defendants engage in industrial activities such as storage and processing of

scrap metal, metal shredding, vehicle maintenance, and vehicle traffic in and out of the facilities.

As precipitation comes into contact with pollutants generated by these industrial activities, it

conveys those pollutants to nearby surface waters.  Contaminated stormwater discharges such as

those from Defendants' metal recycling facilities can and must be controlled to the fullest extent

required by law in order to allow these water bodies a fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over the parties and this action pursuant

to 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United

States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue

declaratory relief in case of actual controversy and further necessary relief based on such a

declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d),

1365(a) (civil penalties).

7.    On January 27, 2021, Plaintiffs provided notice of Defendants' violations of the

Act and of its intention to file suit against Defendants ("Notice Letter") to the above-named

Defendants, the Administrator of the United States Environmental Protection Agency ("EPA");

the Administrator of EPA Region 2; and the Commissioner of the New York Department of

Environmental Conservation ("DEC"), as required by Section 505(b)(1)(A) of the Act, 33 U.S.C.

§ 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and

correct copy of Plaintiffs' Notice Letter is attached as Exhibit A, and is incorporated herein by

reference.

8.    More than sixty days have passed since the notice letter was served on Defendants

and the State and federal agencies. Plaintiffs have complied with the Act's notice requirements. 33 U.S.C. § 1365(b)(1).

9.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

11.     Venue is proper in the United States District Court for the Northern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) and (d) because at least one of the Defendants resides in the Northern District of New York and all of the Defendants reside within New York State.

## III.

## PARTIES

12.     Plaintiff Sierra Club, Inc. ("Sierra Club") is a non-profit environmental organization with members living throughout the State of New York, including members that live, recreate, and/or work in close proximity to the Susquehanna River and Owego Creek; Genesee River and the Erie Canal; Onondaga Lake and Geddes Brook; Cayuga Lake and Sixmile Creek; Canisteo River; Allegheny River, and Chadakoin River—all of which are polluted by industrial stormwater runoff from the Facilities. Sierra Club's mission is to explore, enjoy, and protect the planet; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives. Throughout its 100-year history, Sierra Club has regularly brought suit on behalf of itself and its members to

protect the earth's ecosystems and resources, including enforcement actions under federal environmental laws.

13.     Sierra Club is a chapter-based organization headquartered in California. The Atlantic Chapter of Sierra Club is based in Albany, NY, and includes the following local sub-chapters: the Susquehanna Group (based in Binghamton, NY); the Iroquois Group (based in Syracuse, NY); the Rochester Group (based in Rochester, NY); the Niagara Group (based in Buffalo, NY); and the Finger Lakes Group (based in the Ithaca area, NY). Sierra Club's local chapters work to protect and preserve the ecosystems and natural resources within each of their jurisdictions. Their members routinely participate in water-related activities, including swimming, boating, fishing, conducting hikes and other outings adjacent to the water, observing wildlife, science and nature study, spiritual practices, and more. These members care deeply about and are directly impacted by water quality issues within their jurisdiction, and their use and enjoyment of local waters is diminished by pollution from industrial facilities and a lack of effective enforcement of stormwater regulations. The unlawful discharge of pollutants from the Defendants' facilities into the above-mentioned waters impairs Sierra Club's members' use and enjoyment of these waters. Thus, the interests of Sierra Club's members have been, are being, and will continue to be adversely affected by the Facilities' failure to comply with the Clean Water Act and the General Permit.

14.     Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a not-for-profit environmental organization headquartered in Ossining, New York. Riverkeeper's mission is to protect and restore the Hudson River, from source to sea, and safeguard drinking water supplies through advocacy rooted in community partnerships, science, and law. Riverkeeper achieves its mission through public education, advocacy for sound public policies, and participation in legal and

administrative forums.  Riverkeeper has more than 3,800 members, many of whom reside near to, use, and enjoy the Hudson River and the waters and tributaries of the Hudson River.  The unlawful discharge of pollutants from the Albany Facility into the Hudson River impairs Riverkeeper's use and enjoyment of these waters.  Thus, the interests of Riverkeeper's members have been, are being, and will continue to be adversely affected by the Albany Facility's failure to comply with the Clean Water Act and the General Permit.

15.    The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy, or adequate remedy at law.

16.    Plaintiffs bring this action on behalf of their members, respectively.  Plaintiffs' interests in reducing Defendants' discharges of pollutants into the aforementioned local waters and requiring Defendants to comply with the requirements of the General Permit are germane to Plaintiffs' purposes.

17.    Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Plaintiffs.

18.    Plaintiffs are informed and believe, and thereupon allege, that Defendants are corporations incorporated under the laws of the State of New York.

19.    Plaintiffs are informed and believe, and thereupon allege, that Defendants collectively operate a network of scrap metal recycling facilities doing business as "Upstate Shredding – Weitsman Recycling."  This network includes the following Facilities:

a.    Ben Weitsman of Albany Scrap Metal Yard, located at 300 Smith Boulevard, Albany, NY 12202 ("Albany Facility").  On information and belief, the following

Defendants own and/or operate the Albany Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman of Albany, LLC (collectively, "Weitsman–Albany").

b.      Ben Weitsman of Ithaca Scrap Metal Yard, located at 105 Cherry Street, Ithaca, NY 14850 ("Ithaca Facility").  On information and belief, the following Defendants own and/or operate the Ithaca Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman of Ithaca, LLC (collectively, "Weitsman–Ithaca").

c.      Ben Weitsman of Binghamton Scrap Metal Yard, located at 10 Brandywine Avenue, Binghamton, NY 13901 (or "Binghamton Facility").  On information and belief, the following Defendants own and/or operate the Binghamton Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Weitsman Recycling, LLC (collectively, "Weitsman–Binghamton").

d.      Upstate Shredding Scrap Metal Yard, located at 1 Recycle Drive, Owego, NY 13827 ("Upstate Shredding Facility").  On information and belief, the following Defendants own and/or operate the Upstate Shredding Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Upstate Shredding, LLC (collectively, "Weitsman–Shredding").

e.      Ben Weitsman of Owego Scrap Metal Yard, located at 15 West Main Street, Owego, NY 13827 ("Owego Facility").  On information and belief, the following Defendants own and/or operate the Owego Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Weitsman Recycling, LLC (collectively, "Weitsman–Owego").

f.      Ben Weitsman of Rochester Scrap Metal Yard, located at 80 Steel Street, Rochester, NY 14606 ("Rochester Facility").  On information and belief, the following

Defendants own and/or operate the Rochester Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman & Son of Rochester, LLC (collectively, "Weitsman–Rochester").

g.      Ben Weitsman of Syracuse Scrap Metal Yard, located at 333 Bridge Street, Syracuse, NY 13209 ("Syracuse Facility").  On information and belief, the following Defendants own and/or operate the Syracuse Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman & Son of Syracuse, LLC (collectively, "Weitsman–Syracuse").

h.      Ben Weitsman of Hornell Scrap Metal Yard, located at 6334 Co Rd 64, Hornell, NY 14843 ("Hornell Facility").  On information and belief, the following Defendants own and/or operate the Hornell Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman of Hornell, LLC (collectively, "Weitsman–Hornell").

i.      Ben Weitsman of Allegany Scrap Metal Yard, located at 34 W. Union St., Allegany, NY 14706 ("Allegany Facility").  On information and belief, the following Defendants own and/or operate the Allegany Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman of Allegany, LLC (collectively, "Weitsman–Allegany").

j.      Ben Weitsman of Jamestown Scrap Metal Yard, located at 610 W 8th St., Jamestown, NY 14701 ("Jamestown Facility").  On information and belief, the following Defendants own and/or operate the Binghamton Facility: Ben Weitsman & Son, Inc., Upstate Shredding Disc, Inc., and Ben Weitsman & Son of Jamestown, LLC (collectively, "Weitsman–Jamestown").

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

20.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

21.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  An NPDES permit requires dischargers of pollution to comply with various limitations.

22.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

23.     In New York, the DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by the DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

**Stormwater Permits**

24.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

25.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

26.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

27.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

**New York's General Permit for the Discharge
of Stormwater Associated with Industrial Activity**

28.     As a delegated state NPDES permitting agency, the DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The prior version of the General Permit ("2012 Permit") was in effect between October 1, 2012, and September 30, 2017.  *New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-12-001 ("2012 Permit").  The current version of the General Permit, which renewed the 2012 Permit, went into effect on March 1, 2018, and will expire on February 28, 2023.  Permit No. GP-0-17-004 ("2018 Permit").  The 2018 Permit maintains or makes more stringent the same

requirements as the 2012 Permit.  As appropriate, the 2012 Permit and the 2018 Permit are referred to collectively as the "General Permit."

29.     Under the General Permit, permittees must comply with federal technology-based standards.  The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . ." 33 U.S.C. § 1311(b)(2)(A).  The Act also sets a different standard, "application of the best conventional pollution control technology" for a defined set of five "conventional pollutants."  *Id.* § 1311(b)(2)(E).[1]  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

30.     Accordingly, the Act requires permittees to use best management practices ("BMPs") that reflect, and prohibit the discharge of pollutants above, the level commensurate with application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  *Id.* at §§ 1314(b)(2), (4).

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

31.    The General Permit also ensures compliance with state water quality standards. The Clean Water Act requires that any NPDES permit issued by a state contain any further limits necessary to ensure compliance with a state's water quality standards.  *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

32.    Accordingly, as a state-issued, delegated NPDES permit, the General Permit prohibits permittees from causing or contributing to violations of water quality standards.  *See* General Permit Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705."); II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

33.    In order to discharge polluted stormwater lawfully in New York, industrial dischargers must either obtain coverage under the General Permit and comply with its terms or obtain coverage under and comply with an individual SPDES permit.  33 U.S.C. § 1311(a).

## The General Permit Framework

34.    The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision.  *See* 33 U.S.C. § 1365(f) (defining enforceable effluent

standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title[.]").

35.    At the outset, the General Permit establishes eligibility conditions that Permittees must meet in order to obtain coverage.  General Permit, Part I.  Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent.  2018 Permit, Part I.D.

36.    Among other things, when submitting a Notice of Intent the applicant must identify the specific outfalls through which it will discharge industrial stormwater.  A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls. 2018 Permit, Parts I.D.3 and I.F.

37.    Next, the General Permit also contains a variety of substantive limits that all permittees must meet (see 2018 Permit Part II).  These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and narrative effluent limitations that impose compulsory pollution control and minimization practices.  *See* 2018 Permit, Part II.

38.    In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  *See* 2018 Permit, Part VII.

39.    The General Permit sets forth additional non-numeric technology based effluent limits in the form of required BMPs for all facilities.  2018 Permit, Parts II.A.1-A.12; 2012 Permit, Part I.B.2.  In addition, the General Permit sets forth additional non-numeric effluent limit requiring particular BMPs based on the type of industrial activities occurring at a particular facility (the "sector").  2018 Permit, Part VII; 2012 Permit, Part VIII.

40.    Although permittees may have a primary industrial activity occurring at their site,

they are required to comply with all conditions of the General Permit pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities. To obtain coverage under the General Permit, a discharger must, *inter alia*, submit a complete NOI that provides information on a facility's industrial activities and includes all activities (SIC Codes) being performed at a facility. 2018 Permit, Part I.D.2, I.D.3; 2012 Permit, Part I.C.1.a. When facilities have "more than one industrial activity meeting the description(s) of more than one sector occurring on-site, those industrial activities are considered to be co-located." 2018 Permit, Part VII; *See also* 2012 Permit, Part I.C.1.a. All of the SWPPP and sector-specific permit requirements for each of those co-located activities applies.

41.    The General Permit implements the federal technology-based (BAT/BCT) standards through a combination of general and sector-specific effluent limitations that require the Weitsman Facilities to "minimize" the discharge of pollutants. *See* 2018 Permit, Part II; Part VII; 2012 Permit, Part I.B; Part VIII. The General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice." 2018 Permit, Part II; 2012 Permit, Part I.B.2. BMPs include changes to industrial practices and activities (for example, annual employee training programs) and structural changes to the property (for example, collection basins that reduce stormwater discharged from a facility).

42.    As noted above, the General Permit also implements the Clean Water Act's water quality based protections: it prohibits any discharge that may cause or contribute to a violation of New York's water quality standards as contained in 6 NYCRR Parts 700-705. 2018 Permit, Water Quality Based Effluent Limitation II.C.1.a; 2012 Permit, Part I.B.2. Water Quality Based

Effluent Limitation II.C.1.c of the 2018 Permit holds that "any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited."

43.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting best management practices ("BMPs") and other stormwater control measures. *See* General Permit Part II. BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility). The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit. General Permit, Part II, Part III.A.7.

44.     A permittee must record the BMPs and control measures used to meet the General Permit's effluent limits in a "stormwater pollution prevention plan" ("SWPPP"). General Permit, Part III. The owner or operator must develop, implement, and continually update the plan. General Permit, Part III.

45.     Further, permittees must track, improve upon, and report upon their performance under the General Permit. The General Permit requires regular inspections, monitoring and sampling of stormwater discharges, periodic reporting, and corrective action to reduce pollution when necessary. *See* General Permit Parts IV–VI.

46.     The General Permit also relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" ("benchmarks") for

each pollutant, in order to ensure that permittees are complying with the limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

47.    A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans."  60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish."  60 Fed. Reg. at 50824–25.

48.    Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988).

## Key Conditions of the General Permit

49.    Within that framework, the following specific conditions of the General Permit are particularly relevant in this case with respect to the Weitsman Facilities.

### Effluent Limitations and Requirement for Adequate Control Measures

50.    For facilities in Sector M, the General Permit establishes the following benchmark monitoring cut-off concentrations ("benchmarks"): total suspended solids ("TSS") – 100 mg/L,

oil & grease ("O&G") – 15 mg/L, benzene –50 ug/L, ethylbenzene – 50 ug/L, toluene – 50 ug/L,

xylene – 50 ug/L, total recoverable aluminum – 750 ug/L, total recoverable iron – 1 mg/L, and

total recoverable lead – 69 ug/L.

51.    For facilities in Sector N, the General Permit establishes the following

benchmarks: TSS – 100 mg/L, chemical oxygen demand ("COD") – 120 mg/L, O&G – 15 mg/L,

total recoverable aluminum – 750 ug/L, total recoverable cadmium – 1.8 ug/L, total chromium –

1.8 mg/L, total recoverable copper – 12 ug/L, total recoverable iron – 1 mg/L, total recoverable

lead – 69 ug/L, and total recoverable zinc – 110 ug/L.  For facilities in Subsector N4, the General

Permit includes the following additional benchmarks: benzene – 50 ug/L, ethylbenzene – 50

ug/L, toluene – 50 ug/L, and xylene – 50 ug/L.

52.    For facilities in Sector P, the General Permit establishes the following

benchmarks: O&G – 15 mg/L, COD – 120 mg/L, benzene – 50 ug/L, ethylbenzene – 50 ug/L,

toluene – 50 ug/L, and xylene – 50 ug/L.

53.    For facilities in Subsector N4, Table VII N-1, the 2018 Permit contains the

following numeric effluent limitations: total mercury – 50 ng/L, polychlorinated biphenyls

("PCBs") – 200 ng/L per Aroclor.  For PCBs, the 2018 Permit requires that facilities detecting 65

ng/L per Aroclor make adjustments to their BMPs.

54.    For water bodies with either a designation of Class B or Class C, Table 1 of 6

NYCRR Section 703.5 provides the following water quality standards for pollutants that are

discharged from the Weitsman Facilities (except for the Binghamton Facility): Copper – 13.4

ug/L (Aquatic (Acute) ("A(A)"); lead – 97.1 ug/L (A(A)); zinc – 117 ug/L (A(A)); cadmium –

3.8 ug/L (A(A)); chromium – 0.570 mg/L (A(A)); benzene – 10 ug/L (Health (Fish

Consumption) ("H(FC)"); mercury – $7 \times 10^{-4}$ ug/L (H(FC)); mercury – 1.4 ug/L (A(A)); Mercury

– 0.0026 ug/L for Wildlife; PCBs – 1 x $10^{-6}$ ug/L (H(FC)); and PCBs – 1.2 x $10^{-4}$ ug/L for Wildlife.[2]

55.     For water bodies with a designation of Class A, Table 1 of 6 NYCRR Section 703.5 provides the following water quality standards for pollutants that are discharged from the Binghamton Facility: copper – 13.4 ug/L (A(A)); iron – 300 ug/L (Aesthetic (Water Source)); lead – 97.1 ug/L (A(A)); lead – 50 ug/L (Health (Water Source) ("H(WS)")); zinc – 117 ug/L (A(A)); cadmium – 3.8 ug/L (A(A)); chromium – 0.570 mg/L (A(A)); benzene – 10 ug/L (H(FC); benzene – 1 ug/L (H(WS)); ethylbenzene – 5 ug/L (H(WS)); toluene – 5 ug/L (H(WS)); and xylene – 5 ug/L (H(WS)).[3]

### SWPPP Requirements

56.     The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  2018 Permit, Part III.A; 2012 Permit, Part III.A.

57.     Among other things, the SWPPP must include: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location

---

[2] The A(A) values for copper, lead, zinc, cadmium, and chromium are based on hardness and assume a hardness of 100 ppm.  The values for PCBs apply to the sum of the PCBs.

[3] The A(A) values for copper, lead, zinc, cadmium, and chromium are based on hardness and assume a hardness of 100 ppm.  The standard for xylene is the same regardless of whether it is 1,2-xylene (o-xylene), 1,3-Xylene (m-Xylene), or 1-4-Xylene (p-Xylene).

map and a site map identifying the location of the facility and all receiving waters to which stormwater discharges; a description of control measures and best management practices; schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility. 2018 Permit, Part III.A; 2012 Permit, Part III.C.

58.    The General Permit also includes sector-specific SWPPP requirements.  For facilities in Sector N (N-3 and N-4), these requirements include, *inter alia*, a program to control materials received for processing; BMPs to minimize contact of particulate matter stored indoors or under cover from contacting surface runoff; BMPs to minimize contact of stormwater runoff with stockpiled materials, processed materials, and non-recyclable wastes; BMPs to minimize contact of residual liquids and particulate matter from materials stored indoors or under cover from coming in contact with surface runoff; a program to control what is received at the facility; measures necessary to minimize contact of surface runoff with residual cutting fluids; BMPs to minimize surface runoff from coming in contact with scrap processing equipment; and measures to minimize stormwater contamination at loading/unloading areas.  2018 Permit, Part VII.N; 2012 Permit, Part VIII.N.

59.    For facilities in Sector M, these sector-specific requirements include, *inter alia*, requirements to include BMPs that prevent or minimize contamination of stormwater runoff from all areas used for vehicle dismantling and maintenance; BMPs that prevent or minimize contamination of the stormwater runoff from vehicle, parts and equipment storage areas; BMPs that prevent or minimize contamination of stormwater from all areas used for vehicle, equipment, and parts cleaning; and BMPs that prevent or minimize contamination of the stormwater runoff from all areas used for liquid storage.  2018 Permit, Part VII.N; 2012 Permit,

Part VIII.N.

60.    For facilities in Sector P, these sector-specific requirements include, *inter alia*, requirements to include measures that prevent or minimize contamination of the stormwater runoff from fueling areas; measures that prevent or minimize contamination of stormwater runoff from all areas used for vehicle/equipment cleaning; and measures that prevent or minimize contamination of the stormwater runoff from all areas used for vehicle/equipment maintenance. 2018 Permit, Part VII.N; 2012 Permit, Part VIII.N.

61.    For facilities discharging to impaired waterbodies for which the cause of the impairment is a pollutant of concern included in the benchmarks as set forth in Appendix G of the 2018 Permit, a facility must contain the following SWPPP requirements: identification of the impaired waterbody, a list of pollutants of concern that could be discharged causing the impairment, an identification of each area of the facility that generates stormwater discharges associated with industrial activity that creates a reasonable potential to discharges the pollutants of concern, and specific BMPs to minimize the pollutant of concern from being discharged to the impaired waterbody.  2018 Permit, Part III.D.2.a-d.

<u>Monitoring and Reporting</u>

62.    The General Permit requires operators to collect and analyze samples of industrial stormwater discharges resulting from measurable storm events from every outfall at a facility.   The 2018 Permit requires such sampling and analysis to occur twice per year; the 2012 Permit requires sampling and analysis to occur annually.  2018 Permit, Parts IV and VI; 2012 Permit, Part, IV.

63.    Part VII.N of the 2018 Permit requires operators of facilities subject to Subsector N-4 (Sector N facilities that operate a shredder) to analyze stormwater samples for, *inter alia*,

total mercury and PCBs.

64.    The General Permit requires that facilities discharging stormwater to impaired waterbodies conduct additional monitoring.  Facilities in Sector N3 that are discharging to waters impaired for biological impacts are required to conduct quarterly monitoring of stormwater discharges.  2018 Permit, Parts IV.F.1.c, IV.F.2, Appx. G; 2012 Permit, Part IV.B.1.g, Appx. G.

65.    The General Permit requires that facilities that have an exceedance of a numeric effluent limit, or an exceedance of a benchmark cut-off concentration for a pollutant of concern to an impaired waterbody (i.e. a pollutant that is associated with the impairment), must report the results of the exceedance(s) and the corrective action(s) taken on a Corrective Action form along with the submission of the DMR reporting that exceedance.  2018 Permit, Parts VI.A.2.b, VI.B (Table VI.1); 2012 Permit, Part IV.B.1.g.(6).

Corrective Actions

66.    The General Permit requires "corrective actions" to improve BMPs when, *inter alia*, "the benchmark or numeric effluent limit [stormwater] sample results indicate exceedances of the pollutants."   2018 Permit Part V.A; 2012 Permit Parts IV.B.1.c.(6).(a)-(b), IV.B.1.e.(5).(a)-(b).  A discharger must implement additional structural and non-structural BMPs to prevent a recurrence of those exceedances within 12 weeks.  2018 Permit, Part V.A.1; 2012 Permit, Part III.E.2.b.(1).  If the exceedances still continue, the discharger must continue implementing additional BMPs.  2018 Permit, Part V.A.4; 2012 Permit, Parts IV.B.1.c.(6).(d).(iii), IV.B.1.e.(5).(e).(iii).  Corrective actions are also required if there is evidence indicating that stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to a violation of the water quality standards."  2018 Permit, Part II.C.1.b; See also 2012 Permit, Part I.B.3.  A failure to take the necessary and required corrective

actions is a violation of the permit.  2018 Permit, Parts V, II.C.1.b; 2012 Permit, Parts IV.B.1.c.(6).(d).(iii), IV.B.1.e.(5).(e).(iii).

<u>**Beneficial Uses of New York Surface Waters**</u>

67.     The DEC has classified the portion of the Susquehanna River where the Binghamton Facility discharges as a Class A water.  6 N.Y.C.R.R. § 930.4.

68.     Under New York's Water Quality Standards, a waterbody that is designated Class A is a source of water supply for drinking, culinary or food processing purposes, primary and secondary contact recreation, and fishing.  6 N.Y.C.R.R. § 701.6(a).  Such waters are also meant to be suitable for fish, shellfish, and wildlife propagation and survival.  *Id*.

69.     The DEC has classified the following portions of waters as Class B waters:

a.      The portion the Susquehanna River where the Upstate Shredding Facility discharges.  6 N.Y.C.R.R. § 930.4.

b.      The portion of the Allegany River where the Allegany Facility discharges. 6 N.Y.C.R.R. § 802.4.

70.     Under New York's Water Quality Standards, a waterbody that is designated Class B is best for primary and secondary contact recreation and fishing.  6 N.Y.C.R.R. § 701.7.  Such waters are also meant to be suitable for fish, shellfish and wildlife propagation and survival.  *Id*.

71.     The DEC has classified the following portions of waters as Class C waters:

a.      The portion of the Hudson River where the Albany Facility discharges. 6 N.Y.C.R.R. § 858.4.

b.      The portions of Sixmile Creek and the Cayuga Inlet where the Ithaca Facility discharges.  6 N.Y.C.R.R. § 898.4.

c.      The portion of Owego Creek where the Upstate Shredding Facility and the

Owego Facility discharge.  6 N.Y.C.R.R. § 931.4.

      d.     The portion of the Erie Canal where the Rochester Facility discharges.  6

N.Y.C.R.R. § 847.5.

      e.     The portion of Geddes Brook where the Syracuse Facility discharges.  6

N.Y.C.R.R. § 895.4.

      f.     The portion of the Canisteo River where the Hornell Facility discharges.  6

N.Y.C.R.R. § 811.6.

      g.     The portion of the Chadakoin River where the Jamestown Facility

discharges.  6 N.Y.C.R.R. § 800.8.

72.     Under New York's Water Quality Standards, a waterbody that is designated Class C is best for fishing and also meant to be suitable for fish, shellfish, and wildlife propagation and survival, as well as for primary and secondary contact recreation.  6 N.Y.C.R.R. § 701.8.

73.     The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others.  *See generally* 6 N.Y.C.R.R. §§ 702, 703.  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.  *See id*. §§ 702.2, 702.9.

74.     The DEC has designated the following waterbodies as impaired pursuant to CWA Section 303(d) for failure to meet minimum water quality standards for the following pollutants, *inter alia*: the Geddes Brook as impaired for ammonia; the Hudson River as impaired for PCBs; the Canisteo River as impaired for biological impacts; and the Chadakoin River as impaired for phosphorus and biological impacts.  *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, N.Y. DEP'T ENVTL. CONSERVATION, 4, 20, 27, 28, 31 (Nov. 2016).

**CWA Citizen Enforcement Suits**

75.    Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

76.    Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

77.    Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

78.    Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

79.    Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 per day per violation for violations occurring after November 2, 2015.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

**V.**

**STATEMENT OF FACTS**

**Metal Recycling Facilities**

80.    Metal recycling facilities, especially those with outdoor stockpiling, processing, and segregation of materials, have been identified as a major source of stormwater contamination.  Scrap metal in different stages of corrosion and decay may release a variety of harmful substances, including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene

glycol, paint, and chemical residues. 60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also id*. at 51189–97 (outlining special requirements for Sector N).

81.     In addition to the storage and processing of various sources of scrap metal, such facilities also conduct vehicle operation and maintenance and equipment operation and storage. Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises. Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

### The Weitsman Facilities and Industrial Stormwater Discharges

82.     All the Weitsman Facilities are classified under Standard Industrial Classification ("SIC") Code 5093, meaning that they are primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials.  Activities in this SIC Code are subject to the General Permit's effluent limits for industrial Sector N.

83.     Within Sector N, the General Permit further divides recycling facilities into various sub-sectors, labeled N1 to N5, based on the kinds of recycling activities that occur on site and the potential of those activities to release pollution.  The Weitsman Facilities are all Sector N3 facilities; some are also N4 facilities. A Sector N facility must comply with all of the General Permit's universal requirements, all requirements that apply to every Sector N facility, and all requirements that apply to any of the subsectors that describe the facility's recycling activities.

84.     Defendants have also certified that all the Facilities except the Upstate Shredding Facility are classified under SIC Code 5015, meaning that they are engaged in the dismantling of motor vehicles.  Activities in this SIC Code are subject to the General Permit's effluent limits for industrial Sector M.

85.     Some of the Weitsman Facilities are also engaged in vehicle maintenance and fueling activities that are classified under SIC codes subject to the General Permit's effluent limits for industrial Sector P.

86.     The Albany Facility is classified under SIC Codes 5093 (Sector N3) and 5015 (Sector M).  The Albany Facility collects and discharges stormwater from its 9.8-acre industrial site through at least one discharge location.  Weitsman–Albany has certified that the receiving water for stormwater discharges from the Albany Facility is the Hudson River.

87.     The Ithaca Facility is classified under SIC Codes 5093 (Sector N3) and 5015 (Sector M).  It collects and discharges stormwater from its 2.6-acre industrial site through at least one discharge location.  Weitsman–Ithaca has certified that the receiving water for stormwater discharges from the Ithaca Facility is either a tributary of Sixmile Creek or the Cayuga Lake Inlet, waters that merge less than a quarter mile from the Ithaca Facility.

88.     The Binghamton Facility is classified under SIC Codes 5093 (Sector N3) and 5015 (Sector M).  It collects and discharges stormwater from its 1.4-acre industrial site through at least one discharge location.  Weitsman–Binghamton has certified that the receiving water for stormwater discharges from the Binghamton facility is either Brandywine Creek, an unnamed tributary to Owego Creek, or the Susquehanna River.

89.     The Upstate Shredding Facility is classified under SIC Code 5093 (Sectors N3 and N4).  On information and belief, Plaintiffs allege that since at least September 13, 2019, the Upstate Shredding Facility has also conducted industrial activities for its vehicle maintenance operations associated with its trucking operations, which are activities subject to Sector P of the General Permit.  The Upstate Shredding Facility collects and discharges stormwater from its 14-acre industrial site through at least two discharge locations.  The Facility is situated between

Owego Creek and the Susquehanna River. Weitsman–Shredding has certified that the receiving

water for stormwater discharges from the Upstate Shredding Facility is Owego Creek. Owego

Creek flows into Huntington Creek, which flows into the Susquehanna River.

90.    The Owego Facility is classified under SIC Codes 5093 (Sector N3) and 5015

(Sector M). It collects and discharges stormwater from its 3-acre industrial site through at least

one discharge location. Weitsman–Owego has certified that the receiving water for stormwater

discharges from the Owego Facility is an unnamed tributary to Owego Creek.

91.    The Rochester Facility is classified under SIC Codes 5093 (Sector N3) and 5015

(Sector M). It collects and discharges stormwater from its 2-acre industrial site through at least

two discharge locations. Weitsman–Rochester has certified that the receiving water for

stormwater discharges from the Rochester Facility is the Erie Canal.

92.    The Syracuse Facility is classified under SIC Codes 5093 (Sector N3) and 5015

(Sector M). On information and belief, Plaintiffs allege that Defendants have conducted

industrial operations associated with Sector P since at least September 2017. The Syracuse

Facility collects and discharges stormwater from its 9-acre industrial site through at least two

discharge locations. Weitsman–Syracuse has certified that the receiving water for stormwater

discharges from the Syracuse Facility is Geddes Brook.

93.    The Hornell Facility is classified under SIC Codes 5093 (Sector N3) and 5015

(Sector M). It collects and discharges stormwater from its 1.5-acre industrial site through at least

three discharge locations. Weitsman–Hornell has certified that the receiving water for

stormwater discharges from the Hornell Facility is the Canisteo River.

94.    The Allegany Facility is classified under SIC Codes 5093 (Sector N3) and 5015

(Sector M). It collects and discharges stormwater from its 1.6-acre industrial site through at least

one discharge location.  Weitsman–Allegany has certified that the receiving water for stormwater discharges from the Allegany Facility is the Allegany River.

95.    The Jamestown Facility is classified under SIC Codes 5093 (Sector N3) and 5015 (Sector M).  It collects and discharges stormwater from its 1.6-acre industrial site through at least one discharge location.  The receiving water for stormwater discharges from the Jamestown Facility is the Chadakoin River.

96.    The Weitsman Facilities receive a variety of waste materials, primarily ferrous and non-ferrous metals, and store, process, crush, compact, and in some cases shred these materials.  The majority of activity and storage at each Facility takes place outdoors, where pollutants are exposed to stormwater.

97.    When it rains, the majority of stormwater from the Weitsman Facilities comes from, or is commingled with runoff from, areas at the Weitsman Facilities where industrial processes occur.

98.    Stormwater flowing over areas of the Facilities that are associated with Defendants' industrial activities collects a variety of pollutants, including but not limited to sizeable debris, sediment, oil and grease, metals, organic substances and chemicals that create chemical oxygen demand or alter the pH of receiving waters, and other pollutants.

99.    Stormwater discharged from the Weitsman Facilities flows into channels that discharge to the receiving waters described above in Paragraphs 86 to 95.   These receiving waters are all waters of the United States.

### Defendants' General Permit Coverage

100.    Defendants have applied for and obtained coverage for all of the Weitsman Facilities under the General Permit via Notices of Intent ("NOI") to comply with the terms of the

General Permit that Defendants submitted to the DEC.

    a.   The Albany Facility discharges under Permit ID No. NYR00F370.

    b.   The Ithaca Facility discharges under Permit ID No. NYR00F453.

    c.   The Binghamton Facility discharges under Permit ID No. NYR00D020.

    d.   The Upstate Shredding Facility discharges under Permit ID No. NYR00D022.

    e.   The Owego Facility discharges under Permit ID No. NYR00D019.

    f.   The Rochester Facility discharges under Permit ID No. NYR00D009.

    g.   The Syracuse Facility discharges under Permit ID No. NYR00D751.

    h.   The Hornell Facility discharges under Permit ID No. NYR00F499.

    i.   The Allegany Facility discharges under Permit ID No. NYR00F513.

    j.   The Jamestown Facility discharges under Permit ID No. NYR00D131.

**Defendants Discharge From Unpermitted Outfalls**

101.    Under the General Permit, Defendants are authorized to discharge stormwater into waters of the United States only through the outfalls that Defendants identified in the NOIs.

102.    On information and belief, Plaintiffs allege that, at a number of the Weitsman Facilities, Defendants discharge stormwater associated with industrial activities from a number of point sources that are not identified or authorized as outfalls under the General Permit.

103.    Such unpermitted point sources are located at the entrances/exits of the Ithaca Facility, the Rochester Facility, the Syracuse Facility, the Hornell Facility, the Allegany Facility, and the Jamestown Facility.  Further details related to these failures are set forth in Exhibit A, § II.F.1, and incorporated by reference.

**Defendants Discharge Excessively Polluted Stormwater**

104.    Defendants have taken samples or arranged for samples to be taken of stormwater

discharges from the Facilities.  The sample results were either reported to the DEC on written discharge monitoring reports or to the EPA and DEC jointly through EPA's electronic system for submission of discharge monitoring reports online.  Defendants certified each of those reports pursuant to the General Permit.

105.    In these stormwater sampling results, the Weitsman Facilities have consistently reported high pollutant levels that exceed applicable benchmarks and are evidence of ongoing violations of the effluent limitations set forth in the General Permit.

Benchmark Exceedances

106.    In the past five years, the Albany Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including iron, copper, zinc, COD, and O&G.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.1, 11 (Appx. A), and incorporated by reference.

107.    In the past five years, the Ithaca Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, iron, aluminum, copper, lead, zinc, cadmium, COD, toluene, and xylene.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.2, 11 (Appx. B.), and incorporated by reference.

108.    In the past five years, the Binghamton Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, iron, aluminum, copper, lead, zinc, cadmium, COD, benzene, ethylbenzene, toluene, and xylene. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.3, 11 (Appx. C), and incorporated by reference.

109.    In the past five years, the Upstate Shredding Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, iron, aluminum, copper, lead, zinc, cadmium, and COD.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.4, 11 (Appx. D), and incorporated by reference.

110.    In the past five years, the Owego Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, O&G, iron, aluminum, copper, zinc, cadmium, COD, and xylene.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.5, 11 (Appx. E), and incorporated by reference.

111.    In the past five years, the Rochester Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, O&G, iron, aluminum, copper, lead, zinc, cadmium, and COD.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.6, 11 (Appx. F), and incorporated by reference.

112.    In the past five years, the Syracuse Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including iron, aluminum, copper, lead, zinc, COD, toluene, and xylene.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.7, 11 (Appx. G), and incorporated by reference.

113.    In the past five years, the Hornell Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, iron, aluminum, copper, lead, zinc, cadmium, and COD.  Further details related to these

discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.8, 11 (Appx. H), and incorporated by reference.

114.    In the past five years, the Allegany Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, iron, copper, lead, zinc, and COD.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.9, 11 (Appx. I), and incorporated by reference.

115.    In the past five years, the Jamestown Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, iron, copper, zinc, COD, and toluene.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.10, 11 (Appx. J), and incorporated by reference.

116.    The benchmark exceedances described above in Paragraphs 106 to 115 are evidence of ongoing violations of the non-numeric effluent limitations set forth in the General Permit at the Weitsman Facilities.

<u>Violations of Numeric Effluent Limits</u>

117.    During the past four years, the Upstate Shredding Facility has reported discharges of stormwater from the Facility that exceeded the General Permit's numeric effluent limitations for mercury.

118.    The Upstate Shredding Facility has also reported numerous exceedances of the effluent limitation for PCBs that trigger mandatory BMP revisions in response to those exceedances.

119.    On information and belief, Plaintiffs allege that Weitsman–Shredding has failed

to make those required BMP revisions at the Upstate Shredding Facility.

120.    Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.11 (Appx. D), II.B, and incorporated by reference.

Violations of Water Quality Standards

121.    In stormwater sampling results, the Weitsman Facilities have also consistently reported high pollutant levels that Plaintiffs allege cause or contribute to violations of applicable New York water quality standards.

122.    During the past five years, the Albany Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class C waters, including copper (A(A)), zinc (A(A)), and benzene (H(FC)).  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.1 (Fig. 1), A.11 (Appx. A), C.1, and incorporated by reference.

123.    During the past five years, the Ithaca Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class C waters, including copper (A(A)), zinc (A(A)), lead (A)(A)), and benzene (H(FC)). Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.2 (Fig. 2), A.11 (Appx. B), C.1, and incorporated by reference.

124.    During the past five years, the Binghamton Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class A waters, including copper (A(A)), iron (E(WS)), lead ((A(A) and (H(WS)), zinc (A(A)), benzene (H(FC) and H(WS)), ethylbenzene (H(WS)), toluene (H(WS)), and xylene (H(WS)).  Further details related to these discharges, including specific dates and locations of

discharges, are set forth in Exhibit A, §§ II.A.3 (Fig. 3), A.11 (Appx. C), C.3, and incorporated by reference.

125.    During the past five years, the Upstate Shredding Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class B and C waters, including copper (A(A)), lead ((A(A), zinc (A(A)), cadmium (A(A)), PCBs (H(FC) and Wildlife) and mercury (H(FC) and Wildlife).  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.4 (Fig. 4), A. 11 (Appx. D), C.4, and incorporated by reference.

126.    During the past five years, the Owego Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class C waters, including copper (A(A)), zinc (A(A)), and cadmium (A(A)).  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.5 (Fig. 5), A.11 (Appx. E), C.5, and incorporated by reference.

127.    During the past five years, the Rochester Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards, including Class C waters for copper (A(A)), lead (A(A)), zinc (A(A)), cadmium (A(A)), chromium (A(A)), and the narrative standard for oil and floating substances.  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.6 (Fig. 6), A.11 (Appx. F), C.6, and incorporated by reference.

128.    During the past five years, the Syracuse Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class C waters, including copper (A(A)), lead (A(A)), zinc (A(A)), and benzene (H(FC)).  Further details related to these discharges, including specific dates and locations of

discharges, are set forth in Exhibit A, §§ II.A.7 (Fig. 7), A.11 (Appx. G), C.7), and incorporated by reference.

129.    During the past five years, the Hornell Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class C waters, including copper (A(A)), lead (A(A)), zinc (A(A)), and cadmium (A(A)). Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.8 (Fig. 8), A.11 (Appx. H), C.8, and incorporated by reference.

130.    During the past five years, the Allegany Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class B waters, including copper (A(A)), lead (A(A)), zinc (A(A)), and cadmium (A(A)).  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.9 (Fig. 9), A.11 (Appx. I), C.9, and incorporated by reference.

131.    During the past five years, the Jamestown Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class C waters, including copper (A(A)) and zinc (A(A)).  Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, §§ II.A.10 (Fig. 10), A.11 (Appx J), C.10, and incorporated by reference.

**Defendants' Inadequate Pollution Prevention Practices**

132.    On information and belief, Plaintiffs allege that there are insufficient stormwater control measures and BMPs installed at the Weitsman Facilities.  Plaintiffs are informed and believe, and thereupon allege, that the management practices at the Facilities are currently inadequate to minimize pollution in industrial stormwater discharged to waters of the United

States.  The Facilities lack sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from coming into contact with exposed areas of contaminants.  The Facilities lack sufficient structural controls to prevent the discharge of water once contaminated.  The Facilities lack adequate stormwater pollution treatment technologies to treat stormwater once contaminated.

133.    On information and belief, Plaintiffs allege that track-out pollution (pollution carried on and falling off vehicles and their tires) is found on Defendants' access roadways and near the entrances/exits to the Weitsman Facilities. Stormwater washes these pollutants into storm drains that discharge into the receiving waters.

134.    Based on the inadequacy of pollution prevention practices and the repeated exceedances of benchmarks, numeric effluent limitations, and water quality standards, Plaintiffs allege that since at least March 12, 2016, Defendants have failed to implement BAT and BCT at the Weitsman Facilities for its discharges of TSS, O&G, iron, aluminum, copper, lead, zinc, cadmium, chromium, COD, PCBs, mercury, toluene, benzene, ethylbenzene, xylene, and other pollutants.  As of the date of this Complaint, Defendants have failed to implement BAT and BCT.

<u>Inadequate SWPPPs</u>

135.    On information and belief, Plaintiffs allege that Defendants have not implemented adequate SWPPPs for the Weitsman Facilities.  Plaintiffs are informed and believe, and thereupon allege, that the SWPPPs do not contain accurate site descriptions and maps, including identifying all stormwater flow paths and discharge locations to surface waters or drains, such as the locations of unpermitted outfalls.

136.    On information and belief, Plaintiffs allege that the SWPPPs for the Weitsman

Facilities do not set forth adequate site-specific BMPs, such as housekeeping measures, or adequate structural control measures to be consistent with BAT or BCT for the Facilities, and to meet the General Permit's requirement to minimize pollutant discharges.

137.    Further, on information and belief, Plaintiffs allege that Defendants have failed to keep the SWPPPs for the Weitsman Facilities current by amending them whenever there are changes in design, construction, operation, or maintenance at the Facilities that affect the potential to discharge pollutants, or whenever the SWPPPs have been found to be ineffective in eliminating or significantly minimizing pollutants.

<u>Inadequate Corrective Actions</u>

138.    On information and belief, Plaintiffs allege that Defendants have failed to implement sufficient corrective actions, as evidenced by the Weitsman Facilities' continued stormwater sample results with exceedances of applicable benchmarks and numeric effluent limits and with the reasonable potential to cause or contribute to a violation of water quality standards (as alleged in Sections II.A–C of Exhibit A), as set forth in Exhibit A, § II.E, and incorporated by reference.

<u>Failure to Identify and Control Pollution From Co-Located Industrial Activities</u>

139.    Plaintiffs allege that Weitsman–Shredding has failed to file an NOI certifying that the Upstate Shredding Facility conducts activities pursuant to Sector P and has failed to comply with the SWPPP and sector-specific permit requirements for Sector P at the Upstate Shredding Facility since at least September 13, 2019.

140.    Plaintiffs allege that Weitsman–Syracuse has failed to file an NOI certifying that the Syracuse Facility conducts activities pursuant to Sector P and has failed to comply with the SWPPP and sector-specific permit requirements for Sector P at the Syracuse Facility since at

least September 1, 2017.

**Defendants' Inadequate Monitoring and Reporting Practices**

141.    Plaintiffs allege that over the last five years, Defendants have repeatedly failed to comply with the General Permit's comprehensive monitoring and reporting requirements.

142.    On information and belief, Plaintiffs allege that Weitsman–Ithaca, Weitsman–Rochester, Weitsman–Syracuse, Weitsman–Hornell, Weitsman–Allegany, and Weitsman–Jamestown have failed to collect and analyze stormwater discharges associated with industrial activity at a number of outfalls located at entrance/exits at the Ithaca Facility, the Rochester Facility, the Syracuse Facility, the Hornell Facility, the Allegany Facility, and the Jamestown Facility since at least March 12, 2016.  Further details related to these failures, including specific dates and locations of unmonitored discharges, are set forth in Exhibit A, § II.F.1, and incorporated by reference.

143.    On information and belief, Plaintiffs allege that Weitsman–Albany, Weitsman–Ithaca, Weitsman–Shredding, Weitsman–Hornell, and Weitsman–Jamestown failed to collect and analyze any stormwater discharges from qualifying storm events that occurred on numerous dates during several required monitoring periods on which the Albany Facility, Ithaca Facility, Upstate Shredding Facility, Hornell Facility, and Jamestown Facility were open.  Further details related to these failures, including specific dates and locations of unmonitored discharges, are set forth in Exhibit A, § II.E.3, and incorporated by reference.

144.    On information and belief, Plaintiffs allege that Weitsman–Shredding has failed to submit the required corrective action forms for stormwater discharges that exceeded the numeric effluent limits for mercury at the Upstate Shredding Facility during 2017, 2019, and 2020, as set forth in Exhibit A, § II.F.4.i, and incorporated by reference.

145.    On information and belief, Plaintiffs allege that Weitsman–Hornell has failed to submit the required corrective action forms for the benchmark exceedances of TSS, iron, aluminum, copper, lead, zinc, and cadmium for the Hornell Facility as set forth in Exhibit A, § II.F.4.ii, and incorporated by reference.

146.    On information and belief, Plaintiffs allege that Weitsman–Jamestown has failed to submit the required corrective action forms for the benchmark exceedances of TSS, iron, copper, and zinc for the Jamestown facility as set forth in Exhibit A, § II.F.4.iii, and incorporated by reference.

147.    On information and belief, Plaintiffs allege that, with the exception of the samples taken on specific dates, all of the events and circumstances described above have occurred continuously since at least March 12, 2016.

148.    Information available to Plaintiffs indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Weitsman Facilities due to the continued discharge of contaminated stormwater.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

149.    Further detailed facts, including additional detail on specific dates of incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

## VI.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Unlawful Discharge of Pollutants**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

150.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

151.    This claim is against Weitsman–Ithaca, Weitsman–Rochester, Weitsman–Syracuse, Weitsman–Hornell, Weitsman–Allegany, and Weitsman–Jamestown.

152.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

153.    Defendants are only authorized to discharge stormwater through the outfalls set forth in their NOIs.

154.     Since at least March 12, 2016, these Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point source discharge locations at the Ithaca, Rochester, Syracuse, Hornell, Allegany, and Jamestown Facilities to waters of the United States without an NPDES permit.

155.    Each and every day on which these Defendants discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

### SECOND CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

156.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

157.    This claim is against all Defendants.

158.    The General Permit requires Defendants to implement mandatory general and sector-specific control measures and BMPs in order to minimize the discharge of pollutants from the Facilities.

159.    Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice."  2018 Permit, Part II; 2012 Permit, Part I.B.2.

160.    To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

161.    Based on the industrial activities carried out at the Weitsman Facilities, Defendants must implement the sector-specific control measures specified in the General Permit for Sectors M, N, and/or P.

162.    Plaintiffs are informed and believe, and thereupon allege that, as of the filing date of this Complaint, Defendants have not implemented adequate control measures or BMPs required by the General Permit.

163.    Defendants have failed to implement control measures that meet the BAT/BCT standards at the Weitsman Facilities for their discharges of TSS, O&G, iron, aluminum, copper, lead, zinc, cadmium, chromium, COD, PCBs, mercury, toluene, benzene, ethylbenzene, xylene, and other pollutants in violation of applicable benchmarks and water quality standards set forth in and incorporated by the General Permit.

164.    Each day since March 12, 2016 that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

165.    Defendants have been in violation of the BAT/BCT requirements every day since March 12, 2016.  Defendants continue to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facilities.

### THIRD CAUSE OF ACTION
**Discharges of Stormwater in Violation of Numerical Effluent Limitations
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

166.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

167.    This claim is against Weitsman–Shredding.

168.    Weitsman–Shredding has discharged stormwater from the Upstate Shredding Facility on numerous occasions, as set forth above, in violations of the numeric effluent limitations set forth in the General Permit.

169.    "An exceedance of a Numeric Effluent Limitation is a permit violation."  2018 Permit, Part IV.F.3.c.2; 2012 Permit, Part IV.B.1.e.(5).

170.    Each day since March 12, 2016 that Weitsman–Shredding has discharged mercury and PCBs in excess of the General Permit's limitations, as well discharges of PCBs in excess of those limitations without the required adjustment to BMPs, is a separate and distinct violation of the General Permit and CWA Sections 301(a), 33 U.S.C. §§ 1311(a).  These violations are ongoing and continuous.

**FOURTH CAUS & E OF ACTION**
**Causing or Contributing to Violation of Water Quality Standards**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

171.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

172.    This claim is against all Defendants.

173.    The General Permit states that "[i]t shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705." 2018 Permit, Water Quality Based Effluent Limitation II.C.1.a; 2012 Permit, Part I.B.2.

174.    Plaintiffs are informed and believe, and thereupon allege, that since at least March 12, 2016, Defendants have been discharging polluted stormwater from the Facilities in excess of the applicable water quality standards for copper, lead, zinc, cadmium, chromium, PCBs, mercury, toluene, benzene, ethylbenzene, and xylene in violation of Water Quality Based Effluent Limitation II.C.1.a of the General Permit.

175.    During every rain event, stormwater flows freely over exposed materials, waste products, and other accumulated pollutants at the Facilities, becoming contaminated with pollutants at levels above applicable water quality standards. The stormwater from the Facilities flows untreated into channels that flow into the Facilities' receiving waters.

176.    Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated stormwater are causing or contributing to the violation of the applicable water quality standards in 6 NYCRR Parts 700–705 in violation of Water Quality Based Effluent Limitation II.C.1.a of the General Permit.

177.    Every day since at least March 12, 2016 that Defendants have discharged and continue to discharge polluted stormwater from the Facilities in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Failure to Develop, Implement, and Make Available an
### Adequate Stormwater Pollution Prevention Plan
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

178.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

179.    This claim is against all Defendants.

180.    The General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

181.    The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

182.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

183.    The SWPPP must address both universally applicable elements as well as sector-specific requirements.

184.    The SWPPP must be representative of current site conditions and kept up to date. Defendants have failed to develop, implement, and keep up to date adequate SWPPPs for the Facilities.  Defendants' ongoing failures to develop and implement adequate SWPPPs for the Facilities are evidenced by, *inter alia*, the inadequate stormwater control measures and BMPs at the Facilities and by the Facilities' continuing discharges of excessively polluted stormwater.

185.    Defendants have failed to update the SWPPPs for the Facilities in response to the analytical results of the Facilities' stormwater monitoring.

186.    Each day since March 12, 2016 that Defendants have failed to develop, implement and update adequate a SWPPP for each Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

187.    Defendants have been in violation of the SWPPP requirements every day since March 12, 2016.  Defendants continue to be in violation of the SWPPP requirements each day that they fail to develop and fully implement adequate SWPPPs for the Facilities.

**SIXTH CAUSE OF ACTION**
**Failure to Conduct Routine Site Inspections and Comply with**
**General Monitoring and Reporting Requirements**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

188.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

189.    This claim is against Weitsman–Albany, Weitsman–Ithaca, Weitsman–Shredding, Weitsman–Rochester, Weitsman–Syracuse, Weitsman–Hornell, Weitsman–Allegany, and Weitsman–Jamestown.

190.    The General Permit requires facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in stormwater runoff through the development and proper implementation of the facility's SWPPP.

191.    These Defendants have failed to develop and implement adequate monitoring and reporting programs for the Facilities.

192.    These ongoing failures are evidenced by, *inter alia*, the failures to collect and analyze stormwater samples from all outfalls at the Ithaca Facility, Rochester Facility, Syracuse

Facility, Hornell Facility, Allegany Facility, or Jamestown Facility.

193.     These ongoing failures are further evidenced by, *inter alia*, the failures to collect and analyze stormwater samples from all qualifying events at the Albany Facility, Ithaca Facility, Upstate Shredding Facility, Hornell Facility, or Jamestown Facility.

194.     Each day since March 12, 2016 on which Defendants fail to comply with any of the General Permit's monitoring and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

**SEVENTH CAUSE OF ACTION**
**Failure to Take Corrective Actions**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

195.     Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

196.     This claim is against all Defendants.

197.     When stormwater discharges from a facility have high levels of pollutants that exceed applicable concentrations, limits, and standards, the General Permit requires operators to take "corrective actions" to improve BMPs to eliminate those exceedances.  A failure to take the necessary and required corrective actions is a violation of the permit.

198.     Plaintiffs are informed and believe, and thereupon allege, that these Defendants have failed to implement sufficient corrective actions at the Facilities in response to the Facilities' continued stormwater sample results with exceedances of applicable benchmarks and numeric effluent limits and with the reasonable potential to cause or contribute to a violation of water quality standards.

199.    Each day since March 12, 2016 on which Defendants failed to comply with the General Permit's requirement to take sufficient corrective actions is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

### EIGHTH CAUSE OF ACTION
### Failure to Identify Co-Located Activities and Comply with Permit Conditions
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

200.    Plaintiffs re-allege and incorporate all of the preceding paragraphs as if fully set forth herein.

201.    This claim is against Weitsman–Shredding and Weitsman–Syracuse.

202.    The General Permit requires that facilities with co-located industrial activities must comply with the SWPPP and sector-specific permit requirement for each of those co-located activities.

203.    Plaintiffs are informed and believe, and thereupon allege, that since at least September 13, 2019, Defendants have failed to comply with the General Permit requirements for Sector P facilities at the Upstate Shredding Facility.

204.    Plaintiffs are informed and believe, and thereupon allege, that since at least September 1, 2017, Defendants have failed to comply with the General Permit requirements for Sector P facilities at the Syracuse Facility.

205.    Each day on which Defendants fails to comply with the General Permit's requirements for co-located activities is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act.

## VII.

## PRAYER FOR RELIEF

206.    Wherefore, Plaintiffs respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.   Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facilities except as authorized by and in compliance with the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to immediately implement stormwater pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendants to immediately implement stormwater pollution control and treatment technologies and measures that prevent pollutants in the Facility's stormwater from contributing to violations of any applicable water quality standards or numerical effluent limitations;

f.   Order Defendants to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendants to prepare SWPPPs for the Facilities consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPPs;

h.   Order Defendants to provide Plaintiffs with reports documenting the quality and

quantity of their discharges to waters of the United States and their efforts to comply

with the Act and the Court's orders;

i.   Order Defendants to pay civil penalties of up to $56,460 per day per violation,

pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and

40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendants to take appropriate actions to restore the quality of waters

impaired or adversely affected by their activities;

k.   Order Defendants to pay the costs of litigation, including Plaintiffs' reasonable

investigative costs, attorney fees, expert witness and consultant fees, and other costs,

pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

l.   Award any such other and further relief as this Court may deem appropriate.

Dated this 11th day of May, 2021          Respectfully submitted,
New York, New York

By: _____

Julia Muench

Edan Rotenberg

Douglas Chermak (*pro hac vice* application

forthcoming)

SUPER LAW GROUP, LLC
180 Maiden Lane, Suite 603
New York, NY 10038

*Attorneys for Plaintiffs*

# <u>EXHIBIT A</u>

## Notice of Violation & Intent to File Suit
## January 27, 2021